## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **JAKITA MILLER individually and on behalf of a class of similarly situated African American internal and external job candidates,** | |
| **Plaintiff,** | **CLASS ACTION COMPLAINT** |
| **-- against --** | |
| **ZURICH NORTH AMERICA** | **Civil No.** |
| **Defendant.** | |
| | **JURY TRIAL DEMANDED** |

     1.     Plaintiff and Class Representative Jakita Miller ("Plaintiff" or "Ms. Miller"), through her attorneys Feinstein, Doyle Payne & Kravec, LLC and Levy Davis & Maher, LLP, brings this action to redress race discrimination in her individual capacity and on behalf of the class defined below. Upon personal knowledge as to herself and upon information and belief as to other matters, Plaintiff alleges as follows:

## I.    <u>INTRODUCTION</u>

     2.     Defendant Zurich North America ("Defendant," "Zurich" or "the Company") has engaged in systematic, company-wide discriminatory treatment of qualified African American internal and external job candidates because of their race.

     3.     Zurich publicly touts its commitment to diversity. Upon information and belief, the Company hired its first Head of Diversity and Inclusion in September 2015, two months after the New York District Office of the Equal Employment Opportunity Commission (EEOC) issued a determination finding reasonable cause to believe that Zurich's New York office

discriminated on a class-wide basis against African American candidates in hiring and promotions.

4.      Even as a November 2016 post on Zurich's web site states that "[c]ultivating diversity makes solid business sense," of the twenty four individuals who make up Zurich's Senior Management, Regional Executive and Area Executive teams, only one individual – the head of Human Resources, Brian Little – is African American.

5.      In a 2014 interview in LEADERS Magazine, Mr. Little celebrated Zurich policies that he viewed as essential to the Company's commitment to diversity. Among these, Mr. Little specifically included Zurich's training programs, stating "We can take bright people from all walks of life and train them, particularly those who have a good foundation in business and operations, and who understand how to get work done." He also lauded the Company's commitment to promoting from within: "We are committed to filling our mid-level professional roles and our managerial roles internally whenever possible, and making sure we have the talent pool in place to fill those key roles. We measure this every month to see how we're progressing."

6.      If Zurich were truly committed to practicing what it preaches, Plaintiff Jakita Miller would have been the Company's archetypal success story: an enterprising and intelligent young African American woman with a business background who began as a temporary assistant and worked her way up.

7.      In fact, however, Ms. Miller – who spent her seven years at Zurich determinedly logging training hours, cultivating community involvement, diversifying her business line experience, seeking feedback when her applications did not bear fruit, even applying to training programs despite having come to Zurich with significant prior experience as an underwriter –

has become the archetypal example of the falsity of the Company's promises of equal opportunity for all.

8.    In practice, Zurich's training programs, including its Underwriter Training Program, its internal hire policy, its recruiting practices, and its Human Resources departments as a whole, are administered as part and parcel of a systematic pattern and practice of discrimination in hiring and promotions against qualified African American internal and external job candidates.

9.    Zurich's standard operating procedure of discriminating against African American internal and external job candidates is carried out through, *inter alia*: (a) disparate treatment; (b) discriminatory policies, practices, and procedures in selection, hiring, promotion, and advancement; (c) failure to properly address complaints of race discrimination in the hiring and promotion processes; and (d) retaliation against individuals who make complaints of race discrimination against the Company, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. 2000e, *et. seq*. ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991; and the New York City Human Rights Law ("NYCHRL"), Section 8-107, subdivision 1(a) of the New York City Administrative Code

10.    Zurich also has known or should have known that its business practices – including but not limited to its hiring and promotion practices – have an illegal disparate impact on African American internal and external job candidates. Zurich has failed to take adequate measures to rectify this disparate impact, even when the disparity between its underwriting ranks and the relevant labor market has been highlighted by the EEOC.

11.     The systemic race discrimination described in this Complaint has been and is continuing in nature; indeed, it is Zurich's standard operating procedure, one to which the Company's own Human Resources department displays a deliberate indifference.

12.     Moreover, when victims of Zurich's discriminatory policies and practices engage in the protected conduct of reporting the discrimination to which they have been subjected, the Company responds by retaliating against them.

13.     Ms. Miller seeks, on behalf of herself and the Class and Subclass she seeks to represent, declaratory and injunctive relief; back pay; front pay; compensatory, nominal, and punitive damages; and attorneys' fees, costs, and expenses to redress Zurich's pervasive and discriminatory employment policies, practices, and procedures.

## II.    <u>JURISDICTION AND VENUE</u>

14.     This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. §§ 1331 and 1332(a)(1) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)-5(f), *et seq.*, as amended ("Title VII") to redress and enjoin employment practices of Defendant in violation of these federal statutes.

15.     This Court has supplemental jurisdiction over alleged New York City Human Rights Law claims under 28 U.S.C. § 1367 in that they involve a common nucleus of operative fact with the federal claims and because these New York City Human Rights Law claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the Constitution.

16.     Venue is proper in the Southern District of New York under 28 U.S.C. §§ 1391(b) & (c) and 42 U.S.C. § 2000e-5(f) because a substantial part of the wrongful conduct complained

of herein occurred in this District; Defendant transacts substantial business in this District; and Defendant maintains employment records related to this action in New York.

17.     Ms. Miller has standing to bring this suit as she has exhausted administrative remedies by timely filing her administrative charge before the Equal Employment Opportunity Commission ("EEOC"), which on July 15, 2015 issued a determination finding "that there is reasonable cause to believe that Respondent [Zurich] has discriminated against Charging Party [Plaintiff Miller] and against a class of similarly aggrieved African American applicants or employees because of their race." After an attempt at conciliation failed, the EEOC issued Plaintiff a Notice of Right to Sue on December 2, 2016, in accordance with which she now timely files this action. Ms. Miller's administrative charge and the EEOC's Determination gave notice to Zurich of class-wide allegations of race discrimination in hiring and promotions.

## III.     THE PARTIES

18.     Between May 2010 and July 2016 **PLAINTIFF JAKITA MILLER** was an African American "employee" at Zurich, as defined by Title VII and 42 U.S.C. § 1981. Ms. Miller was employed by Zurich N.A. as a full-time permanent employee from approximately May 2010 through July 2016. She currently resides in Brooklyn, NY.

19.     **DEFENDANT ZURICH NORTH AMERICA** ("Defendant," "Zurich" or "the Company") is the American subsidiary of Zurich Insurance Group AG, a Swiss insurance carrier with approximately 55,000 employees worldwide. Defendant Zurich is headquartered in Schaumburg, Illinois. Per its publicly available fact sheet, Zurich insures 90 percent of Fortune 500 companies, and attained nearly $3 billion in operating profit in 2015. Zurich regularly transacts business in this District. Its Manhattan office is currently located at 1 Liberty Plaza.

## IV.   FACTUAL ALLEGATIONS

### A.   Plaintiff Miller's Allegations

20.   Plaintiff Miller began her employment with Zurich through a staffing agency in July 2009, and was hired as a full-time permanent employee into an Underwriter Assistant position in May 2010.

21.   Ms. Miller, who received her Bachelor of Science degree in Accounting from Hampton University with honors, began her career in underwriting as a Markel University Intern at Shand Morahan & Co. in Deerfield, Illinois, where she worked from November 2002 through August 2004.

22.   After graduating the Markel University Rotational Trainee Program, Ms. Miller was assigned to the Southeast territory and given underwriting authority. Ms. Miller's lines of coverage included Small Non-Profit Directors & Officers, Employment Practices Liability, Tenant Discrimination and Small Business Errors & Omissions.

23.   From August 2004 through March 2006, Ms. Miller worked as an underwriter in AIG's Domestic Brokerage Group in Chicago. While at AIG, she continued her education in broker negotiating, sales presentations and financial analysis.

24.   From AIG, Ms. Miller was recruited to the Chicago office of Marsh USA, Inc., where she worked from March 2006 through January 2009 as a broker. In this role Plaintiff Miller provided business opportunities to Zurich.

25.   When her father became ill in 2009, Ms. Miller moved from Chicago to New York City to be closer to her family in Virginia.

26.   Plaintiff Miller obtained her first position at Zurich, as a Technical Assistant in the Environmental Group, through a staffing agency.

27.    Between July 2009 and May 2010, Ms. Miller applied to both Underwriter and Junior Underwriter positions at Zurich. Upon information and belief, as a temporary employee working at Zurich through a staffing agency, Ms. Miller was considered an external candidate for these positions. Ms. Miller was not selected for either position.

28.    Upon information and belief, the Underwriter position for which Ms. Miller applied was given to a less qualified Caucasian woman, Victoria Taddeo-Piro, who upon information and belief did not have Ms. Miller's prior experience as an underwriter or experience in financial lines. Indeed, after Ms. Taddeo-Piro assumed the Underwriter position, she called Ms. Miller on multiple occasions for advice on how to handle her underwriting duties.

29.    Around the same time, another less qualified Caucasian candidate, Andrew Randazzo, was also selected by Zurich for a Junior Underwriter role. Unlike Plaintiff Miller, who had prior experience as an underwriter, upon information and belief Mr. Randazzo had worked at a pizza shop prior to becoming an Underwriting Assistant at Zurich, from which position he was promoted to a Junior Underwriter role after less than four years. Mr. Randazzo was subsequently promoted again to a role managing Underwriting Assistants, including Ms. Miller herself.

30.    In May 2010, Ms. Miller was hired as an Underwriting Assistant in the Management Solutions Group at Zurich.

31.    Upon information and belief, insurance Underwriters and related positions at Zurich are organized into business units, divisions and groups according to the nature of the insurance they underwrite. The North American Commercial business unit includes Property, Casualty, Middle Markets and Construction divisions. The Management Solutions Group is part of the Middle Markets division.

32.     Upon information and belief, all business units rely on the same general hierarchy, with Underwriting Assistants working under Underwriters. During some part of the class period Zurich had a Junior Underwriter position; that position was subsequently replaced by Zurich's Underwriter Training Program. Each ascending job title carries increasing status, seniority, responsibility, and earnings opportunities.

33.     Between May 2010 and July 2016, Plaintiff Miller applied for more than twenty positions at Zurich relating to the Underwriter role, including different levels of Underwriter and several positions that were viewed as steps toward an Underwriter position from the Assistant position Ms. Miller occupied, including Quality Assurance Specialist, Business Analyst, and Associate Auditor.

34.     In approximately mid-2013, having been unsuccessful in obtaining a position that would have constituted an advancement, Ms. Miller applied to and was selected for a lateral Claims Administrator position. She accepted the position in hopes that increasing her experience of different business lines would prove an asset in her continued efforts to advance at the Company.

35.     Of the five interviews granted to Plaintiff Miller out of her approximately 25 applications (one of which was for the lateral position of Claims Administrator, and one for a training program), none were for the many positions she had applied to in lines of business where she already had extensive experience as both an underwriter and a broker when she came to Zurich (including Directors and Officers, Employment Practices, Fiduciary and Crime/Kidnap & Ransom Liability).

36.     On the few occasions when Plaintiff Miller was able to obtain feedback from Zurich recruiters as to why she did not receive a given position for which she had applied (or, in

most cases, even an interview), that feedback was often inconsistent with Ms. Miller's actual record.

37.    For example, in approximately May 2015, Plaintiff Miller reached out to Bonnie Kronstat, a recruiter for two of the positions for which Ms. Miller had recently applied.

38.    With regard to one underwriter position for which Ms. Miller had applied, Ms. Kronstat asserted that Ms. Miller would not be a good fit because she lacked Environmental experience, despite the fact that Ms. Miller's first job at Zurich, which she held for nearly a year, was in the Environmental group. When Ms. Miller responded with reference to her Environmental experience, Ms. Kronstat responded that this experience was insufficient, and that in any event the position had been cancelled.

39.    With respect to another underwriter position for which Plaintiff Miller had applied, this time in the Management Solutions Group, Ms. Kronstat initially asserted that Ms. Miller did not receive the position because Zurich was looking for someone with underwriting experience. In response, Ms. Miller pointed out that she had experience both as an underwriter and as a broker in the Management Liability sector. Indeed, as an underwriter at AIG, Ms. Miller worked in the same line of business using the same policy forms; the only appreciable difference was that, as a larger organization, AIG might offer more types and higher risk coverage.

40.    When reminded of Plaintiff Miller's directly relevant prior experience, Ms. Kronstat claimed that Zurich wanted someone with "more recent" experience. When Ms. Miller further inquired why Zurich hired so many recent college graduates with no underwriting experience for the underwriter position, Ms. Kronstat asserted that these graduates were part of Zurich's training programs.

41.    Ms. Miller subsequently applied for various training and internship programs at

Zurich, including Zurich's Underwriter Training Program, and was told that she was over-qualified for those positions, despite the fact that Zurich's Underwriter Training Program is advertised as geared towards "highly talented college graduates with the drive to become successful members of our Underwriting team."

42.     Ms. Kronstat also suggested that Ms. Miller had erred by applying as an external rather than an internal candidate.

43.     When Plaintiff Miller asked Ms. Kronstat for additional clarification on this point, noting that she had previously received a phone interview for a position for which she had initially applied through the external candidate application process, she was referred to Catherine Spera in Human Resources.

i.    *Zurich Discriminates Against Both Internal and External African American Job Candidates*

44.     At different times between 2010 and 2016, Plaintiff Miller applied for the above-described positions at Zurich through both internal and external application processes.

45.     While there are technical differences between internal and external job postings at Zurich (for example, external postings often included more information about the nature of the position in question), the only perceptible distinction between the two is the Company's widely touted policy of promoting from within.

46.     In fact, however, as indicated in the EEOC's cause determination with respect to Zurich's New York office, and upon information and belief as to positions nationwide, neither qualified African American internal nor external candidates were hired by Zurich at rates proportional to their presence in either the applicant pool or the relevant labor market.

47.     Specifically, the EEOC stated in its July 15, 2015 determination that "The Commission's investigation reveals that Respondent's New York Office's hiring/promotion of

African-American employees to underwriter positions is significantly lower than both the percentage of African-American applicants and the relevant census job data. Respondent hired/promoted zero African-American employees for certain underwriting positions, and non-African American employees were hired/promoted for most of the underwriting positions for which Charging Party and other African-American candidates applied. Credible witnesses' testimony supports Charging Party's allegations that qualified African-American applicants were passed over for positions for which non-African-American candidates were hired. In fact, the Commission identified a class of African-American applicants from 2011 to 2013 who were more qualified than the hired non-African American candidates in Respondent's New York Office, yet not hired for the underwriter positions."

ii.    *Zurich Human Resources Facilitated Defendant's Policy and Practice of Discrimination Against African American Job Candidates*

48.    Ms. Miller had already contacted Catherine Spera – the Human Resources representative to whom Recruiter Bonnie Kronstat finally referred her in 2013 – on her own initiative a year earlier, to attempt to understand why she was not even receiving interviews for positions for which she was clearly qualified.

49.    Beginning in approximately April 2012, Ms. Miller reached out on several occasions to Ms. Spera, an HR Employee Relations Consultant at Zurich, seeking feedback as to why her efforts at advancement were so unsuccessful despite her objective qualifications for the positions for which she was applying.

50.    Specifically, Ms. Miller requested from Ms. Spera a list of positions to which she had applied as of that date along with the reasons why she had not been selected. Ms. Spera responded that she "checked with the Director of Recruiting, and this is not information that they provide."

51.    During a subsequent exchange, in approximately July 2012, Ms. Spera stated that she would not expect recruiters to give feedback to a candidate as to why she didn't receive an interview, but nevertheless suggested that Ms. Miller needed to "work on differentiating yourself through development opportunities."

52.    Specifically, Ms. Spera suggested that Plaintiff Miller seek out "relevant technical training" through the Company's internal training system, Zurich Academy. She also encouraged Ms. Miller to begin taking Chartered Property Casualty Underwriter ("CPCU") courses.

53.    In fact, while between 2010 and 2016 Plaintiff Miller completed almost 100 courses on Zurich Academy, she never became aware of any Zurich Academy courses that could be described as "relevant technical training."

54.    With regard to technical knowledge, Ms. Miller regularly found that the Caucasian underwriters for whom she worked at Zurich lacked knowledge about proper underwriting practices.

55.    The CPCU designation requires extensive coursework and completion of multiple exams. Like Ms. Miller, employees of color seeking advancement were regularly encouraged by Zurich to take CPCU courses, while at the same time the Caucasian underwriters for whom they worked were not required to hold the CPCU designation; indeed, many did not even hold undergraduate degrees in a business-related subject matter.

56.    During an in-person meeting in or around mid-2012, Ms. Spera suggested that Plaintiff Miller needed to engage in unspecified "rebranding" in order to increase her chances at promotion. Upon information and belief, such "rebranding" would not have been a prerequisite for a Caucasian candidate.

57.    At every turn, Ms. Miller's efforts to increase her chances for promotion through

concrete efforts were thwarted by Zurich management and HR.

58.     For example, in approximately June 2012 when Ms. Miller received written accolades from the Head of International Product Underwriting at Zurich and asked Ms. Spera to include them in her personnel file, Ms. Spera stated that Zurich's "file guidelines" would only permit the inclusion of "more formal types of feedback" in a candidate's HR file. Instead, Ms. Spera encouraged Plaintiff Miller to "reference" such accolades in her own mid-year and year-end reviews.

59.     Throughout her time at Zurich, Plaintiff Miller received performance reviews ranging from fully meeting to exceeding expectations.

60.     During her first years as an Underwriting Assistant, however, Ms. Miller's performance reviews were completed by Andrew Randazzo, the Caucasian Junior Underwriter who had just himself been promoted from Underwriting Assistant despite being notably less qualified for the position than Ms. Miller herself.

61.     In her formal performance reviews, Mr. Randazzo assessed Ms. Miller as only meeting expectations, despite acknowledging that she regularly went beyond her daily assigned duties and received consistently positive feedback from others. When Ms. Miller asked as part of her review process what she would have to do to receive an Exceeds Expectations rating, she received no clarification from Mr. Randazzo.

62.     Though Ms. Miller diligently charted her Key Strengths, Development Needs and Career Aspirations in her annual Individual Development Plan ("IDP"), advancement at Zurich continued to elude her.

### iii.    Plaintiff Miller Files Her EEOC Charge and Zurich Retaliates

63.     Ms. Miller filed a charge of race discrimination with the EEOC on November 11,

2013.

64.    At some point after Ms. Miller filed her EEOC charge, Zurich management stripped her of job duties, including issuing authority letters to claims attorneys. In early 2016, Ms. Miller became aware that her counterparts in other offices who still had these job duties carried with them the title of Team Lead, a title Ms. Miller was never offered even the chance to seek.

65.    In approximately 2015, while Ms. Miller's race discrimination case was pending at the EEOC, Zurich hired a "diversity officer" and asked Ms. Miller to join the Company's African American Alliance, of which she became a Board Member.

66.    Plaintiff Miller's 2015 mid-year review subsequently noted that she had "assumed a leadership role in two company-sponsored organizations," and stated that "[t]o ensure proper coordination and coverage of her unique responsibilities," Ms. Miller would be required to record what were characterized as "non work related activities" in a team log "**AND also seek management approval for activities requiring more than two hours away from her daily tasks.**" (emphasis in original)

67.    Plaintiff Miller's 2015 annual review acknowledged that she was a "strong corporate citizen," noting that she "stepped up when called upon" and provided "strong support for her business partners." However, the review also stated that Ms. Miller's "communication style" presented an "opportunity area" because "I have received some feedback that at times she can be to [sic] direct in her communication style and this can be frustrating to others and can have a negative impact on her message."

68.    Upon information and belief, the perception of Plaintiff Miller as excessively direct arose because, due to her 10+ years of experience in underwriting by this time, Ms. Miller

knew considerably more about underwriting policy and process than many of the Caucasian underwriters for whom she worked.

69.    In or around March 2016 Ms. Miller applied for several more positions at Zurich. For one, a trainee program position, Ms. Miller was granted a phone interview but ultimately informed that she had insufficient experience. For another position, Ms. Miller received both a phone and an in person interview. During her in person interview, a manager asked Ms. Miller how she felt about diversity. Ms. Miller did not receive that position, either.

70.    When it became clear to Ms. Miller that she would not advance at Zurich due to her race, she sought employment elsewhere, accepting a Junior Underwriter position at Travelers in July 2016.

B.    **Zurich's Discriminatory Policies and Practices**

71.    Zurich's Senior Leadership implements centralized, nationwide policies and practices regarding selection of internal and external job candidates for positions that result in the hiring and promotion of disproportionately low numbers of African American candidates.

72.    Zurich's policies and practices, including its Human Resources policies, training programs, Recruitment (responsible for both hiring and promotion), and performance evaluation policies and procedures, are administered in a manner that results in disproportionately fewer African American candidates receiving positions than their objective qualifications would merit.

73.    Zurich has a nationwide practice of administering its Human Resources ("HR") policies in a manner that results in the perpetuation of discrimination against African American internal and external job candidates and the participation or acquiescence of the highest levels of Zurich management in that discrimination.

74.    Zurich's practices in administering its HR policies demonstrate a reckless disregard or deliberate indifference to its African American internal and external job candidates by failing to address, prevent or remedy impermissible race discrimination throughout the company, of which it has long been aware.

75.    Zurich's recruiting, training, performance evaluation and human resources, policies, practices, and procedures incorporate the following discriminatory practices: (a) refusing or failing to establish and/or follow policies, practices, procedures, or criteria that reduce or eliminate disparate impact and/or intentional biases or stereotypes and (b) refusing or failing to provide equal training opportunities to African American internal and external job candidates.

76.    Where policies or practices intended to curb discrimination exist, they lack meaningful quality controls, standards, implementation metrics, and means of redress, such that Senior Management and Human Resources may ignore, disregard, minimize, cover up, mishandle, or otherwise fail to respond properly to evidence of discrimination in the workplace.

77.    Zurich's policies and practices that discriminate against African Americans, described here, are long-standing and have been administered and operated substantially as they were at the time the complaint in this action was first filed, or with the same effects, since Plaintiff Miller first applied to work at Zurich.

78.    The ongoing administration of these long-standing discriminatory policies and practices represent a continuing violation of the applicable laws against race discrimination.

## V.    <u>CLASS ACTION ALLEGATIONS</u>

79.    Ms. Miller as Class Representative, on behalf of herself and all others similarly situated, brings her claims under Title VII, 42 U.S.C. § 1981, and the New York City Human

Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8–107(1)(a).

80.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and (c)(4), Class Representative seeks injunctive, declaratory and monetary relief based on Zurich's pattern and practice of race discrimination in connection with hiring and promotion throughout her employment with Zurich.

81.    As described above, Zurich's hiring and promotion policies, practices, and procedures represent a pattern or practice of intentional discrimination against African Americans.

82.    As also described above, Zurich's hiring and promotion policies, practices, and procedures that have a disproportionate adverse impact on African Americans are not valid, job-related, or justified by business necessity.  Further, there are alternative criteria, methods or measures available to Zurich that do not have an adverse disparate impact on African Americans, or have less of a disparate impact, and achieve the same business ends.

83.    Zurich's discriminatory hiring and promotion policies, practices, and procedures described here and to which the Class Representative and the Class Members are subject, are established at Zurich's corporate management level.

84.    Zurich's discriminatory employment policies, practices, and procedures apply uniformly and systematically to Zurich sales representatives across the Company and throughout the country, throughout all levels and organizational units of Zurich.

85.    The adoption, administration and application of Zurich's discriminatory policies, practices, and procedures across the Company cause discrimination against African Americans to be Zurich's standard operating procedure.

86.    Because of Zurich's pattern and practice of discrimination against African

Americans, the Class Representative and members of the proposed Class have suffered harm, including lost compensation, wages, back pay, and employment benefits.

87.     The Class Representative and Class Members have no plain, adequate, or complete remedy at law to redress, and this suit is their only means of securing adequate equitable relief from Zurich's continuing pattern and practice of discrimination against African Americans alleged here.   The Class Representative and Class Members are now suffering irreparable injury from Zurich's unlawful policies, practices, and procedures alleged here, and will continue to suffer unless those policies, practices, and procedures are enjoined by this Court.

### A.     Class Definition

88.     As to Counts I and II, Class Representative seeks to represent a class ("Class"), of which she is member, consisting of:

> All qualified African American internal and external candidates who applied for but did not receive one or more Underwriter, Junior Underwriter, or Underwriter Trainee (collectively "Underwriter") positions in any of Zurich North America's business units at any time between January 15, 2013 and the date of judgment.

89.     Upon information and belief, there are more than 300 individuals in the proposed Class.

90.     As to Count III, Class Representative seeks to represent a Subclass ("NYC Subclass"), of which she is member, consisting of:

> All qualified African American internal and external candidates who applied for but did not receive one or more Underwriter, Junior Underwriter, and Underwriter Trainee (collectively "Underwriter") positions in any of Zurich North America's business units in the City of New York any time between November 11, 2010 and the date of judgment.

91.     Upon information and belief, there are more than 100 individuals in the proposed NYC Subclass.

92.    Class Representative is a member of the Class and Subclass she seeks to represent.

93.    Class Representative reserves the right to amend the class definition and/or the subclass definitions in a separate motion for class certification or otherwise based on information obtained in discovery or legal developments.

### B.    Efficiency of Class Prosecution of Common Claims

94.    Certification of a class and subclass of African American internal and external job candidates is the most efficient and economical means of resolving the questions of law and fact that are common to the claims of Class Representative and the proposed Class and Subclass.

95.    The individual claims of Class Representative require resolution of common questions to determine whether Zurich has engaged in a systemic pattern and practice of discrimination against African American internal and external job applicants through its hiring and promotion practices. Class Representative seeks remedies to eliminate the adverse effects of such discrimination in her own life, career, and working conditions, to eliminate the adverse effects of race discrimination in the lives, careers, and working conditions of the proposed class members, and to prevent continued race discrimination in the future.

96.    Class Representative has standing to seek such relief because she has been and continues to be adversely affected by the discriminatory policies and practices alleged. Zurich caused her injuries through its discriminatory practices, policies, and procedures, and disparate treatment of internal and external job applicants who are African American. The injuries Zurich's discriminatory policies and practices have caused and will cause to Ms. Miller and other qualified African American internal and external job candidates can be redressed through

systemic relief, including an injunction, and other appropriate class-wide and individual remedies sought in this action.

97.     In addition, proper relief for the claims of Class Representative, Class Members, and Subclass Members who are not now employed by Zurich in the Underwriter positions for which they applied includes their placement in the Underwriter positions they would have held absent Zurich's discriminatory pattern or practice. Accordingly, each of these persons has a personal interest in equitable relief from the racially discriminatory policies, practices, and procedures of Zurich.

98.     To obtain relief for herself and Class and Subclass Members, Class Representative will first establish the existence of systemic race discrimination in the hiring and promotion of individuals to Underwriter positions as the premise for the relief she seeks. Without class certification, the same evidence and issues would be subject to relitigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations.

99.     Class Representative's individual and class claims are premised upon the traditional bifurcated method of proof and trial for disparate impact and systemic disparate treatment claims of the type at issue in this case. Such a bifurcated method of proof and trial is the most efficient method of resolving such common issues.

## C.     Numerosity and Impracticability of Joinder

100.     The Class and Subclass that Class Representative seeks to represent are so numerous that joinder of all members is impracticable. Upon information and belief, the members of the proposed Class currently number more than 40, as do members of the proposed Subclass.

101.    Additionally, Zurich's pattern and practice of discrimination makes joinder impracticable by discouraging qualified internal or external African American candidates from seeking Underwriter positions, thereby making it impractical and inefficient to identify many members of the Class or Subclass prior to determination of the merits of Zurich's class-wide liability.

### D.    Common Questions of Law and Fact

102.    The prosecution of the claims of Class Representative will require the adjudication of numerous questions of law and fact common to the Class and Subclass.

103.    The common issues of law and fact include, *inter alia*: (a) Whether Zurich administers its hiring and promotion policies, practices, and procedures such that qualified African American internal and external candidates disproportionately are not hired or promoted to Underwriter positions; (b) Whether Zurich employs valid selection criteria in connection with the hiring and promotion of individuals to Underwriter positions, and, if so, whether there are alternative means available to Zurich that have less adverse impact and achieve the same business ends; (c) Whether Zurich's hiring and promotion policies, practices, and procedures that discriminate against African Americans are long-standing, have been administered and operated in substantially the same manner or with the same effects for the time Class Representative and members of the Class and NYC Subclass have sought to be hired or promoted into Underwriter positions at Zurich and represent a continuing violation of the applicable laws against race discrimination.

### E.    Typicality of Claims and Relief Sought

104.    Class Representative's claims are typical of the claims of the proposed Class and Subclass. Class Representative asserts each of the types of claims that she asserts on behalf of

the proposed Class and Subclass. The relief she seeks for herself is also typical of the relief sought on behalf of the proposed Class and Subclass.

105.   Like the members of the proposed Class and Subclass, Class Representative is a qualified African American individual who has applied to one or more Underwriter positions as both an internal and an external candidate at Zurich.

106.   Zurich's pattern and practice of discrimination against African Americans is accomplished through Company-wide policies regarding hiring and promotion that apply to all internal and external applicants for Underwriter positions, and thus applies to and affects the Class Representative and members of the Class and Subclass in the same or similar ways.

107.   Zurich's pattern and practice of discrimination against African American internal and external applicants for Underwriter positions occurs throughout all levels and organizational units of Zurich and thus applies to and affects Class Representative and members of the Class and Subclass in the same or similar ways.

108.   The relief necessary to remedy the claims of Class Representative is the same as that necessary to remedy the claims of the proposed Class and Subclass Members.

### F.    Adequacy of Representation

109.   Class Representative's interests are coextensive with those of the members of the proposed Class and Subclass.

110.   Class Representative is willing and able to represent the proposed Class and Subclass fairly and vigorously.

111.   Class Representative has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and financial demands required to litigate an employment discrimination class action of this size and complexity. The combined interests,

experience, and resources of Class Representative and her counsel to litigate competently the class claims at issue in this case clearly satisfy the adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

### G.    Requirements of Rule 23(b)(2)

112.    Zurich has acted or refused to act on grounds generally applicable to Class Representative and the proposed Class and Subclass.

113.    Zurich has acted on grounds generally applicable to Class Representative and the proposed Class and Subclass through the Company-wide policies and practices alleged here.

114.    Zurich's systemic pattern and practice of discrimination and refusal to act on nondiscriminatory grounds justify the requested injunctive and declaratory relief with respect to the Class and Subclass as a whole.

115.    Injunctive and declaratory relief are the predominant relief sought in this case, and flow directly from proof of systemic pattern or practice race discrimination by Zurich. In turn, entitlement to declaratory and injunctive relief provides a factual and legal predicate for recovery by Class Representative and Members of the Class and Subclass of monetary and nonmonetary remedies for losses caused by the systemic discrimination, as well as their recovery of nominal and punitive damages.

### H.    Requirements of Rule 23(b)(3)

116.    The common issues of fact and law affecting the claims of Class Representative and proposed Class and Subclass Members – including, but not limited to, the common issues identified above – predominate over any issues affecting only individual claims because they can be decided on class-wide evidence and dispose of important issues appropriate to the claims of the Class and Subclass as a whole.

117.    A class action is superior to other available means for fairly and efficiently adjudicating the claims of Class Representative and members of the proposed Class.  The cost of proving Zurich's pattern and practice of discrimination makes it impracticable for Class Representative and members of the proposed Class to pursue their claims individually.

118.    The bifurcated method of determining pattern or practice claims provides an established, efficient and manageable means of determining both liability to the Class as a whole and class-wide relief, and to individual class members, including their entitlement to monetary remedies for losses caused by the systemic discrimination and other appropriate individual relief.

**I.    Requirements of Rule 23(c)(4)**

119.    This action may be certified as a class pursuant to Rule 23(c)(4) because the Class Issues apply to all class members and to all Zurich locations nationwide (as to Counts I and II), and as to all NYC Subclass members and to all Zurich locations in New York City (as to Count III).

120.    Class Representative alternatively seeks to maintain this action as a class pursuant to 23(c)(4), seeking partial certification of the common questions of law and fact.

**VI.    COUNTS**

**COUNT I**

**VIOLATION OF TITLE VII**
**(On Behalf of Class Representative and the Class Against Defendant)**

121.    Class Representative re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

122.    This Count is brought on behalf of Class Representative and all members of the Class. Class Representative has exhausted her administrative remedies and complied with all statutory prerequisites to her Title VII claim.  Class Representative filed a charge of race

24

discrimination on or about November 11, 2013 with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued a July 15, 2015 Determination concluding that "there is reasonable cause to believe that Respondent has discriminated against Charging Party and against a class of similarly aggrieved African American applicants or employees because of their race." In particular, the EEOC concluded that "the Respondent's New York Office's hiring/promotion of African American employees to underwriter positions is significantly lower than both the percentage of African American applicants and the relevant census job data*." Id.* The Commission "identified a class of African American applicants from 2011 to 2013 who were more qualified than the hired non-African American candidates in Respondent's New York Office, yet not hired for the underwriter positions." *Id*.

123.   Zurich has discriminated against Class Representative and all members of the Class in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e et seq., as amended by the Civil Rights Act of 1991, because of or on the basis of their race.

124.   In particular, Zurich has discriminated against Class Representative and all members of the Class through the policies and practices alleged here that subject them to discrimination in hiring and promotions on the basis of their race, in violation of Title VII.

125.   Zurich's policies, practices, and procedures have had a disparate impact on Plaintiff and the members of the Class with respect to their selection of internal and external candidates for Underwriter positions, and related terms and conditions of employment.

126.   Zurich's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Class Representative and the members of the proposed class, entitling Class Representative and the members of the Class to punitive damages.

127.    By reason of the continuous nature of Zurich's discriminatory conduct, which persisted throughout the class period, Plaintiff and the members of the Class are entitled to the application of the continuing violation doctrine to all violations alleged herein.

128.    As a result of Zurich's conduct alleged in this Complaint, Class Representative and the members of the Class have suffered and continue to suffer harm, including but not limited to: lost wages, lost back pay and front pay, lost bonuses, and other forms of compensation, lost benefits, lost interest, and attorneys' fees and costs. Class Representative and the members of the Class are entitled to recover such monetary and other damages, punitive damages, interest, and attorneys' fees and costs from Defendant under Title VII.

129.    As a further result of Zurich's unlawful conduct, Class Representative and the members of the Class have suffered and continue to suffer, *inter alia*, impairment to their name and reputation, humiliation, embarrassment, emotional and physical distress, and mental anguish. Plaintiff are entitled to recover damages for such injuries from the Company under Title VII.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981
**(On Behalf of Class Representative and the Class Against Defendant)**

130.    Class Representative re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

131.    Zurich's discrimination against Class Representative and all members of the Class is in violation of the rights of Class Representative and the Class afforded them by the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.

132.    Through the conduct alleged in this Complaint, Zurich intentionally deprived Class Representative and the members of the Class of the same rights as are enjoyed by Caucasian citizens to the creation, performance, enjoyment, and all benefits and privileges, of

their contractual employment relationship with Zurich, in violation of 42 U.S.C. § 1981.

133.    As a result of Zurich's discrimination in violation of Section 1981, Class Representative and the members of the Class have on the basis of their race been denied employment opportunities providing substantial compensation and benefits, thereby entitling them to injunctive and equitable monetary relief; and have suffered anguish, humiliation, distress, inconvenience and loss of enjoyment of life because of Zurich's actions, thereby entitling them to compensatory damages.

134.    In its discriminatory actions as alleged above, Zurich has acted with malice or reckless indifference to the rights of the above-named African American Class Representative and members of the Class, thereby entitling them to an award of punitive damages.

135.    To remedy the violations of the rights of plaintiffs and the class secured by Section 1981, Class Representative and members of the Class request that the Court award them the relief prayed for below.

## COUNT III

### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107(1)(a)
### (On Behalf of Class Representative and the NYC Subclass Against Defendant)

136.    Class Representative re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

137.    Zurich has discriminated against Class Representative and all members of the NYC Subclass in violation of Section 8-107, subdivision 1(a) of the New York City Administrative Code, by subjecting them to different treatment on the basis of their race.

138.    Zurich has discriminated against Class Representative and all members of the NYC Subclass by treating them differently from and less preferably than similarly-situated non-African American employees, and by subjecting them to discriminatory failures to hire, and

denials of promotions, in violation of the New York City Administrative Code.

139.    As a result of Zurich's conduct alleged in this Complaint, Class Representative and all members of the NYC Subclass have suffered and continue to suffer harm, including but not limited to lost earnings, lost benefits, lost future employment opportunities, other financial loss, and noneconomic damages.

140.    Plaintiff has satisfied the filing requirements of Title 8 of the Administrative Code of the City of New York.

## COUNT IV

### VIOLATION OF TITLE VII
### (On Behalf of Plaintiff Jakita Miller Against Defendant)

141.    Ms. Miller re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

142.    Ms. Miller filed a Charge of Discrimination at the EEOC on or about November 11, 2013. Upon information and belief, the EEOC served a copy of the Charge on Defendant no more than 30 days thereafter.

143.    Defendant's failure and refusal to consider Ms. Miller for an underwriting position thereafter was, in whole or in part, the product of animus against her for having filed a charge of discrimination with the EEOC.

144.    Defendant's inaccurate assertions, in or about May 2015, that Ms. Miller was not considered for underwriting positions because she lacked sufficient environmental experience and relevant underwriting experience was, in whole or in part, the product of animus against her for having filed a charge of discrimination with the EEOC.

145.    Defendant's repeated assertion of purported reasons for its failure and refusal to consider Ms. Miller for an underwriting position (including, *inter alia*, that her experience was

28

not sufficiently recent, that it gave underwriting positions to inexperienced recent college graduates because they had completed Defendant's training course (followed by its refusal to admit her to that training course because she was "overqualified"), that she required additional technical training, that she should "rebrand" herself, that she should have applied as an internal candidate, etc.) was, in whole or in part, the product of animus against Plaintiff for having filed a charge of discrimination with the EEOC.

146.    Defendant retaliated against Plaintiff in violation of Title VII.

## COUNT V

### VIOLATION OF 42 U.S.C. § 1981
### (On Behalf of Plaintiff Jakita Miller Against Defendant)

147.    Ms. Miller re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

148.    Defendant retaliated against Plaintiff in violation of 42 U.S.C § 1981.

## COUNT VI

### VIOLATION OF NEW YORK CITY ADMINISTRATIVE CODE § 8-107(7)
### (On Behalf of Plaintiff Jakita Miller Against Defendant)

149.    Ms. Miller re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

150.    Defendant retaliated against plaintiff in violation of the New York City Human Rights Law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Miller, on her own behalf and on behalf of the Class, prays that this Court:

A.      Certify this case as a class action under Federal Rules of Civil Procedure Rule 23 (a), (b)(2) or (b)(3), or alternatively, under (c)(4), on behalf of the proposed Plaintiff Class and NYC Subclass; designate the proposed Class Representative as representative of this Class and Subclass; and designate Plaintiff's counsel of record as Class Counsel;

B.      Declare and adjudge that Zurich's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Class Representative and Class members under Title VII of the Civil Rights Act of 1964, as amended, and 42 U.S.C. § 1981; and declare and adjudge that Zurich's employment policies, practices, and/or procedures challenged herein are illegal and in violation of the rights of Class Representative and the NYC Subclass members under Section 8-107, subdivision 1(a) of the New York City Administrative Code;

C.      Issue a permanent injunction against Zurich and its partners, officers, trustees, owners, internal and external job candidates, agents, attorneys, successors, assigns, representatives, and any and all persons acting in concert with them from engaging in any conduct violating the rights of Plaintiff, class members, and those similarly situated as secured by 42 U.S.C. §§ 2000e *et seq.*, 42 U.S.C. § 1981 and the NYCHRL, and order such injunctive relief as will prevent Zurich from continuing its discriminatory practices and protect others similarly situated;

D.      Order Zurich to initiate and implement programs that will: (i) provide equal employment opportunities for African American internal and external candidates for the covered positions; (ii) remedy the effects of Defendant' past and present unlawful employment policies, practices, and/or procedures; and (iii) eliminate the continuing effects of the discriminatory practices described above; and

E.      Order Zurich to initiate and implement systems of hiring, and promoting African American internal and external job candidates in a non-discriminatory manner; and

F.      Order Zurich to establish a task force on equality and fairness to determine the effectiveness of the programs described in D through E above, which would provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal employment opportunity; (ii) the assurance that injunctive relief is properly implemented; and (iii) a quarterly report setting forth information relevant to the determination of the effectiveness of the programs described in D through E above;

G.      Order Zurich to place or restore Class Representative and the Class members into those jobs they would now be occupying but for Zurich's discriminatory policies, practices, and procedures;

H.      Order that this Court retain jurisdiction of this action until such time as the Court is satisfied that Zurich has remedied the practices complained of herein and are determined to be in full compliance with the law;

I.      Award nominal, compensatory, and punitive damages to Class Representative and the Class and Subclass members;

J.      Award litigation costs and expenses, including, but not limited to, reasonable attorneys' fees, to Class Representative and Class and Subclass members;

K.      Award backpay, front pay, lost benefits, preferential rights to jobs and other damages for lost compensation and job benefits with pre-judgment and post-judgment interest suffered by Class Representative and the Class members and Subclass members to be determined at trial;

L.     Order Zurich to make whole Class Representative and Class and Subclass members by providing them with appropriate lost earnings and benefits, reinstatement opportunities, and other affirmative relief;

N.     Award any other appropriate equitable relief to Class Representative and Class and Subclass members; and

O.     Award any additional and further relief as this Court may deem just and proper.

## VIII.  **JURY DEMAND**

Plaintiff demands a trial by jury on all issues triable of right to a jury.

Dated:  March 2, 2017

By:

_____
Deborah K. Marcuse
FEINSTEIN DOYLE PAYNE & KRAVEC
429 Fourth Avenue, Ste. 1300
Pittsburgh, PA 15219
(412) 281-8400, ext. 121
(412) 281-1007 (fax)

29 Broadway, 24th Floor
New York, NY 10006-3205
Tel.: (212) 952-0014
dmarcuse@fdpklaw.com

Jonathan Bernstein
LEVY DAVIS & MAHER, LLP
39 Broadway, Suite 1620
New York, NY 10006
(212) 371-0033
(212) 371-0463 (fax)
jbernstein@levydavis.com